ORIGINAL

1

2

3

4

5

6

7

8                                      **UNITED STATES DISTRICT COURT**

9                                     **SOUTHERN DISTRICT OF CALIFORNIA**

10    JAMES EDWARD SPENCE,                          CASE NO. 14cv1624-BAS (KSC)

11                                   Petitioner,     **REPORT AND
                                                     RECOMMENDATION FROM THE**
12           vs.                                     **MAGISTRATE JUDGE RE:
                                                     DENYING THE PETITION**
13    JEFFREY BEARD, Secretary, et al.,

14                                  Respondent.

15

16            This Report and Recommendation is submitted to United States District Judge

17    Cynthia Bashant pursuant to Title 28, United States Code, Section 636(b), and Civil

      Local Rules 72.1(d) and HC.2 of the United States District Court for the Southern
18
      District of California. Based on the moving and opposing papers, and for the reasons
19
      outlined below, this Court **RECOMMENDS** that the Petition be **DENIED**.
20
                                       **I. FEDERAL PROCEEDINGS**
21
              On July 8, 2014, Petitioner James Edward Spence ("petitioner"), a California
22
      state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas Corpus pursuant
23
      to 28 U.S.C. § 2254. [Doc. 1] On July 10, 2014, the District Court dismissed the
24
      Petition without prejudice due to the petitioner's failure to name a proper respondent.
25
      [Doc. 2] On August 1, 2014, the petitioner filed a First Amended Petition (hereinafter
26
      "FAP") [Doc. 4], which is the operative pleading in this case. This Court set a briefing
27
      schedule, indicating that the respondent's Response would be due on October 13, 2014,
28
      and any Traverse would be due by November 12, 2014. [Doc. 5] On October 10, 2014,

                                                   - 1 -                        14cv1624-BAS (KSC)

1   the People filed a Response and Lodgments. [Docs. 11, 12-1 to 12-20] No Traverse has
2   been filed.   As set forth in detail below, the FAP raises four distinct claims of
3   constitutional violations based on the petitioner's state court criminal trial.

## II.  STATE PROCEEDINGS

5       On January 28, 2010, an information was filed charging the petitioner with four
6   counts of sexual offenses against a minor ("D.," the daughter of petitioner's on-again,
7   off-again romantic partner). [Lodg. 2, Vol. 1, pp. 9-10] On July 7, 2010, an amended
8   information was filed charging the petitioner with seven counts of sexual offenses
9   against a minor, and this amended information was the operative information at trial.
10  *Id.* at 87.   The petitioner pled not guilty and proceeded to trial by jury on August 5,
11  2010. [Lodg. 1, Vol. 1, p. 192] On August 17, 2010, the jury convicted him of two
12  counts of sexual offenses against a child 10 years old or younger, occurring on April
13  20, 2009 (Count One, sexual penetration in violation of California Penal Code §
14  288.7(b);[1] Count Two, sodomy in violation of § 288.7(a)). [Lodg. 2, Vol. 2, pp. 357-62]
15  The jury also convicted the petitioner of two counts of sexual activity against the child
16  in March 2009 (Count Four, committing a lewd act in violation of § 288(a); Count
17  Five, oral copulation in violation of § 288.7(b).   *Id.*  He was acquitted of two other
18  charges and an additional count was dismissed on the People's motion. *Id.*; [Lodg. 1,
19  Vol. 1, p. 1187]

20      The petitioner was sentenced to a total term of 55 years to life on April 1, 2011.
21  [Lodg. 2, Vol. 2, p. 437] He timely appealed his conviction and sentence to the
22  California Court of Appeal through counsel on October 18, 2011. [Lodg. 3] In his
23  direct appeal, the petitioner raised four discrete claims, which are re-iterated in the
24  instant Petition before the Court and will be discussed in detail below.  The California
25  Court of Appeal denied the petitioner's appeal on all four grounds in a published
26  opinion dated December 27, 2012. [Lodg. 6] Through counsel, the petitioner submitted
27

28  ───────────────
        [1] All future statutory references will be to the California Penal Code unless
    otherwise noted.

a petition for review to the California Supreme Court on February 1, 2013, raising only two of the four grounds that had been denied by the Court of Appeal. [Lodg. 7] The California Supreme Court denied the petition without comment on April 11, 2013. [Lodg. 8]

### III.  EVIDENCE ADDUCED AT TRIAL

The facts that follow are taken verbatim from the California Court of Appeal's published opinion.[2]  Federal habeas courts rely upon facts developed in state courts pursuant to 28 U.S.C. § 2254(e).  *See Sumner v. Mata*, 449 U.S. 539, 545-47 (1981) (stating that deference is owed to factual findings of both state trial and appellate courts).  Furthermore, this Court has conducted a careful, independent review of the complete trial record, and finds that the Court of Appeal's opinion accurately captures the relevant factual and procedural background of the case.

The petitioner's challenges to his convictions do not include any claims of insufficiency of the evidence.  Where a detailed examination of the record and of the factual findings of the state court is required to address the petitioner's claims, specific citations to the record are provided in subsequent sections.

#### A.  Background

When these incidents occurred in 2009, Spence was about 25 years old and had been living for about 10 years as a housemate to [the child complainant] D.'s mother, D. Smith (Ms. Smith), who was older and had four children, two with Spence.  Spence acted as the stepfather to D., who was born in 1998 and whose father did not live with the family.  Due to various problems with one of the other children in the home, the family had a child protective services (CPS) caseworker, Melinda Pellegrino.  Ms. Smith wanted to break up with Spence and have him move out and leave the family, but he did not want to do so.  The night of April 20, Spence and his male friend Dale Williams were at Ms. Smith's house overnight, and she was out with friends.

---

[2] Though the California Court of Appeal's opinion is published as *People v. Spence*, 151 Cal. Rptr. 3d 374 (Cal. Ct. App. 2012), this Report and Recommendation will refer to the version supplied by the Respondent as Lodgment 6.

On the morning of April 21, 2009, D. told Ms. Smith that while Ms. Smith had been absent the night before, her dad (which is what she called Spence) "raped her," by telling her to come into the bathroom and pull down her pants, and putting his finger in her vagina. Ms. Smith drove her son to school, discussed the matter further with D., and then woke Spence to have him go to a Kaiser clinic with them. Spence said it was not true. At Kaiser, D. was seen by a male nurse, Matthew Sager, and she was crying and upset while telling him that her "dad" had pulled her pants down and touched her private parts. She said something similar had happened a month ago.

Nurse Sager told Ms. Smith that Kaiser's policy was to send such patients to Children's Hospital. Ms. Smith became angry and left with D., so the nurse called 911 and the police followed their car. When Ms. Smith got home, she called her CPS caseworker, Pellegrino, and they talked to D. about what happened. Pellegrino told Ms. Smith and D. they should cooperate with police officers, who had arrived at the Smith home. Spence called home and Pellegrino told him he needed to come home, but he did not do so.

D. was taken to Children's Hospital, where she did not want to speak to a caseworker, but agreed to speak with Dr. Lorena Vivanco, a board certified pediatrician specializing in child abuse treatment. While crying and upset, D. told Dr. Vivanco that the night before, her dad Spence took her into the bathroom and pulled down her pants, and then started touching her "privacy" and put his fingers inside her privacy. Then he put his privacy inside her "butt" after turning her over and putting something slippery on his own privacy. The month before, while D. was asleep, Spence came to her bed and tried to put his "privacy" into her mouth, after putting his finger in it first. D. told Dr. Vivanco that she had not told anyone about the first incident because she did not think it would happen again and Spence told her not to tell.

While D. was being examined by Dr. Vivanco, Detective Dana Hoover was at the hospital talking to Ms. Smith. Spence called Ms. Smith and said that he wanted to talk to the detective to clear things up. Detective Hoover asked him to call her the next day, which he did, and she made arrangements for him to come to the police station for an interview on the following day.

//
//

B.  Interview, Arrest and Charges

Spence came to the police station on April 22, was escorted upstairs and interviewed by plainclothes Detective Hoover and Detective Cindy Brady.  Although he originally said he had not sexually touched D. and offered to take a polygraph examination to clear himself, the detectives learned that the equipment was out of order and nothing happened.[3]

Eventually, Spence admitted to the detectives that he had molested D. in April, but not in March.  The detectives asked him if he wanted to apologize to D., and he said he could not write and did not know how to begin, so Detective Hoover offered to take down his dictation, wrote down what he said, and kept the original (the dictated letter).  Hoover and the other detective then told him to go take care of his affairs and to turn himself in for arrest in a few days, because that would look better for him and for the family.

On April 28, 2009, Spence came to the police station to turn himself in for arrest.  Two handwritten, signed letters about his remorse and sadness regarding the incidents, dated April 27, 2009 and addressed to D. and Ms. Smith, were found in his pocket.[4]  Detective Hoover made copies of these (here, designated the two copied letters) and returned the originals to him.  Charges were filed April 30, 2009.

On July 7, 2010, the San Diego County District Attorney filed an amended information alleging three counts against Spence arising out of the April 20, 2009 incident with D. (sexual penetration by putting his finger in her vagina, sodomy and sexual intercourse, all with a child 10 years old or younger; § 288.7, subds. (a), (b)).[5]

/ /

---

[3] At trial, the parties stipulated that all references to the polygraph exam idea must be redacted.

[4] Detective Hoover testified in rebuttal that Spence told her he wrote the two copied letters(those found in his pocket when he was arrested).

[5] Two other counts were charged stemming from the March incident but no convictions were obtained on them (count 6, sexual penetration with a child 10 years old or younger (§ 288.7, subd. (b) [finger in the child's vagina]); and count 7, engaging in sodomy with a child 10 years old or younger (§ 288.7, subd. (a) [penis in the child's anus])).  Count 3, regarding sexual intercourse, was eventually dismissed.

1
2
3
4
5
6

In preparation for his defense at trial, Spence was interviewed by an expert psychologist, Dr. Carroll Waymon, to evaluate his educational level and his ability to make decisions when confronted with female authority figures, such as the detectives. Dr. Waymon reviewed Spence's continuation school records and talked to him for about two and one-half hours, and evaluated him as having a grade level of about third through fifth grade. He determined that Spence has dyslexia, which affects his general functioning abilities and makes him dependent on others, rather than being able to make his own independent judgments.

7
8

C. Suppression Hearing and Trial Cases-in-Chief

9
10
11
12

At the outset of trial, Spence brought a motion to suppress his statements at the April 22 interview with the detectives, contending it was a custodial interrogation and his unwarned statements were not voluntary. (§ 1538.5.) At the suppression hearing, Detective Hoover testified about writing the dictated letter at Spence's request, when he told her could not write or read well.

13
14
15
16
17

Spence testified that he only agreed to let Detective Hoover write the dictated letter for him because he thought that was what she wanted to hear him say. When the prosecutor presented him with the two copied letters (as found in his pocket when he was taken into custody) and asked if he wrote them, Spence said the signature and handwriting looked like his own and he guessed he must have written them.

18
19
20

The court denied Spence's motion to suppress his statements to detectives, ruling that he was not in custody at the time and the statements were voluntary. No ruling on admissibility on any letters was made at that time.

21
22
23
24

At trial, D. testified in the prosecution's case-in-chief and was accompanied to the witness stand by a victim advocate from the District Attorney's office, as well as a therapy dog that sat at her feet and behind the stand. Defense objections, that this level of support was unnecessary and excessive under the statutory scheme, were overruled.

25
26
27

Other percipient and expert witnesses testified at trial, including Ms. Smith and Pellegrino. Detective Hoover testified and played for the jury a tape of the April 22 interview, and displayed an enlargement of the dictated letter.

28

Laboratory tests on D.'s clothing and her person (mouth, genital and anal areas) showed there were traces of sperm cells on the mouth and clothing but no seminal fluid. Not enough material was collected for a complete DNA analysis, but neither Spence nor his friend Williams, who were at the house that night, could be excluded as an African-American sperm cell donor of the cells on the clothing.

Dr. Vivanco testified about her forensic examination of D., which showed physical evidence of bruising and spotting in the vaginal area and hymen. Dr. Vivanco concluded there was definite evidence of some sexual abuse or contact. Although there was no visible indication of anal penetration, the doctor stated that she could not rule out that it happened, since a child's anus may stretch under such duress.

The prosecutor asked Dr. Vivanco about possible explanations for D.'s story. Specifically, she asked, "if someone by the name of [D.] says that she is sexually assaulted by someone by the name of James Spence, is there any evidence that you tested in this case that contradicts that story?" The expert replied that there were no test results excluding Spence, i.e., "All of the DNA that I have ends up having some consistency with the DNA test from Mr. Spence." [*See* discussion in Section XX, *supra*.]

Spence did not testify at trial. His defense theories were that Ms. Smith had D. falsely accuse him of sexual assault to get rid of him, or that his mental deficiencies led him to make a false confession. He also contended that the perpetrator might have been his friend Dale Williams, who was at the house that night and who could have left the sperm cells found in the lab tests. Spence presented numerous character witnesses and several expert witnesses, to be described in the discussion portion of this opinion.

Briefly, with regard to the issue about Spence's ability to write letters, his expert psychologist, Dr. Waymon, testified about his evaluation of the apparent mental deficiencies and low level of functioning that Spence had, based in part upon a two and one-half hour interview and his review of school records. Dr. Waymon stated he did not believe Spence had the ability to read or write at a normal adult level, based upon two unusual writing samples he had obtained from Spence during his interview (a sentence or two in tiny writing with eccentric spacing; they are not in the appellate record).

1
2
3
4

    During cross-examination about his opinions, Dr. Waymon was shown the two copied letters obtained by detectives when Spence was arrested, and he opined that it was unlikely that Spence had written them, since the handwriting and printing in them were consistent with that of a high school graduate or adult, rather than with a low functioning individual such as Spence.

5
6

D.  Rebuttal Phase of Prosecution; Instructions and Verdict; Motion and Judgment

7
8

    In rebuttal testimony, Detective Hoover identified the copied letters and stated that at the time of his arrest, Spence told her that he had written them. However, she never put that in a written report.

9
10
11
12
13
14
15
16

    In response to Dr. Waymon's testimony, the prosecutor sought to rebut or impeach his expert opinion by bringing in other evidence that Spence had the ability to write and had done so, based on the copied letters found in his pocket when he was arrested.  She proposed to read into the record Spence's testimony at the suppression hearing, in which he admitted that those signatures looked like his and he guessed he must have written them.  Defense counsel unsuccessfully objected that Spence had a right to testify at his suppression hearing, and his testimony about the letters at that hearing should not be used against him either in the case-in-chief or in rebuttal....The dictated and copied letters were admitted into evidence at the close of the defense case and during rebuttal.

17
18
19
20
21
22
23

    The jury received instructions about the limited purposes for which they could consider the evidence of the two copied letters, to determine Spence's writing level and ability.  His oral statements before trial were to be considered along with all other evidence.  Regarding his statements to the expert, they were to be used for evaluating the expert's opinion, not for the truth of their content.  More generally, the jury was told, inter alia, that the fact a crime was charged is not evidence the charge is true (CALCRIM No. 220), and they must decide the case based on the evidence, not on any extrinsic factors such as sympathy, passion, or prejudice (CALCRIM No. 200).

24
25
26

    The jury deliberated and found Spence guilty of counts 1, 2, 4, and 5, but acquitted him of two other counts stemming from the March incident.  On the People's motion, the court dismissed count 3.

27

    ...

28

[Lodg. 6, pp. 4-11]

1
2

## IV. PETITIONER'S CONTENTIONS

The FAP presents the following claims:

(1) The state appellate court ignored controlling United States Supreme Court authority when it ruled that the petitioner's testimony from a pre-trial suppression hearing could be admitted to impeach his expert witness;

(2) The petitioner was improperly convicted of committing sexual assault against a child "ten years of age or younger" when the child was older than 10 years but less than 11 years at the time of the offense;

(3) The petitioner was denied due process of law when the trial court allowed the child to have both a therapy dog and a support advocate accompany her to the witness stand during her trial testimony, and when the trial court allowed the prosecutor to introduce the support advocate to the jury as a "victim" advocate; and

(4) The petitioner was denied due process when the prosecutor posed an improper hypothetical question to a medical witness that essentially asked the witness to comment on the strength of the prosecutor's evidence in the case. [Doc. 4, pp. 6-9]

## V. DISCUSSION

For the following reasons, the Court finds that the petitioner has failed to establish that the adjudication of his claims by the state courts was contrary to, or an unreasonable application of, clearly established federal law as decided by the United States Supreme Court, or was based upon an unreasonable determination of the facts in light of the evidence presented in state court. Accordingly, the Court recommends the FAP be denied.

### A. Standard of Review

Federal habeas corpus relief is available only to those who are in custody in violation of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a "highly deferential standard" for evaluating state-court rulings on federal habeas review, and

1  "demands that state-court decisions be given the benefit of the doubt." *Woodford v.*
2  *Visciotti*, 537 U.S. 19, 24 (2002) (citations omitted).  Under AEDPA, a federal habeas
3  petition shall not be granted with respect to any claim that was adjudicated on the
4  merits in State court proceedings unless the adjudication of the claim: 1) resulted in a
5  decision that was contrary to, or involved an unreasonable application of, clearly
6  established Federal law, as determined by the Supreme Court of the United States; or
7  2) resulted in a decision that was based on an unreasonable determination of the facts
8  in light of the evidence presented in the State court proceeding.   28 U.S.C.
9  § 2254(d)(1)-(2).

10  The Ninth Circuit has explained that a state court decision is "contrary to"
11  clearly established Supreme Court precedent under § 2254(d)(1) if the state court
12  applies a rule that contradicts the governing law set forth in Supreme Court cases, or
13  if the state court confronts a set of facts that are materially indistinguishable from a
14  Supreme Court precedent but nevertheless arrives at a different result. *Juan H. v.*
15  *Allen*, 408 F.3d 1262, 1270 (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).
16  On the other hand, a state court decision is an unreasonable application of clearly
17  established federal law if "the state court identifies the correct governing legal
18  principle" from a Supreme Court decision "but unreasonably applies that principle to
19  the facts of the prisoner's case." *Id.* (citing *Williams*, 529 U.S. at 413).

20  "[A] federal habeas court may not issue the writ simply because the court
21  concludes in its independent judgment that the relevant state-court decision applied
22  clearly established federal law erroneously or incorrectly.... Rather, that application
23  must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003)
24  (internal quotations and citations omitted).  Clearly established federal law "refers to
25  the holdings, as opposed to dicta," of the United States Supreme Court's decisions.
26  *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

27

28

1    If this Court determines that a constitutional error occurred during the

2    petitioner's state court proceedings, the Court must then determine whether harmless

3    error analysis is warranted. The Supreme Court has recognized that most constitutional

4    errors can be harmless. *Arizona v. Fulminante*, 499 U.S. 279, 306 (1991) (citations

5    omitted). Constitutional errors that are determined to be "trial errors" – that is, those

6    occurring during the presentation of the case to the jury – are subject to the harmless

7    error standard articulated in *Kotteakos v. United States*, 328 U.S. 750, 766 (1946).

8    *Brecht v. Abrahamson*, 507 U.S. 619, 623, 629-38 (1993). Under *Brecht*, habeas relief

9    is only warranted if the trial error had "a substantial and injurious effect" on the

10    verdict. *Id.* at 623. Examples of trial errors include the erroneous admission or

11    exclusion of evidence, improper jury instructions, restriction of a defendant's right to

12    cross-examine a witness for bias, and improper comment on a defendant's silence at

13    trial. *Fulminante*, 499 U.S. at 306-307 (citations omitted).

14    **B. Petitioner Is Not Entitled To Habeas Relief On The Basis Of The Trial Court's**

15    **Admission of Petitioner's Suppression Hearing Testimony to Impeach Expert Witness (Claim 1)**

16    The petitioner contends in Claim 1 that his due process rights were violated

17    when the trial court permitted the prosecutor to impeach the testimony of Dr. Carroll

18    Waymon with statements the defendant had made under oath at a pre-trial suppression

19    hearing. [Doc. 4, p. 6] Specifically, the petitioner contends that the trial court's ruling

20    was in clear contravention of the United States Supreme Court's precedent in *James*

21    *v. Illinois*, 493 U.S. 307 (1990). *Id.*

22    The Court has independently reviewed the trial record pertaining to this claim

23    and confirms that the California Court of Appeal's opinion, reprinted in Section III,

24    correctly summarizes the relevant facts. Dr. Waymon testified at trial that the

25    handwriting on two apology letters found in the petitioner's pocket "does not appear

26    to be Mr. Spence's writing at all." [Lodg. 1, Vol. 5, p. 1155] In rebuttal, the trial court

27    permitted the prosecutor to impeach Dr. Waymon's testimony by reading to the jury a

28    portion of the petitioner's testimony at a pre-trial suppression hearing:

1
2
**Question [Prosecutor]**: Do you recognize this letter?  So, is this your signature, and you wrote that letter, sir?

3
**Answer [Spence]**: I don't remember.  But, yeah, it looks like it.

4
5
6
**Question**: Now I'm showing you People's Exhibit No. 2.  At the bottom appears to be the name James Spence.  Is that your handwriting and your signature?

7
**Answer**: It looks like it.

8
[Lodg. 1, Vol. 6, p. 1304]

9
10
11
12
13
14
15
16
17
18
19
20
This Court finds that the petitioner's claim lacks merit in two respects.  First, the California Court of Appeal's denial of the petitioner's first claim is not contradictory to, nor an unreasonable application of, clearly established federal law.  *See* 28 U.S.C. § 2254(d)(1).  This Court concludes that constitutional law had not been so "clearly established" by the Supreme Court as to make the conclusion of the state court objectively unreasonable.  *See Campbell v. Rice*, 408 F.3d 1166, 1170 (9th Cir. 2005) ("AEDPA's 'clearly established law' requirement limits the area of law on which a habeas court may rely to those constitutional principles enunciated in Supreme Court decisions.").  The petitioner has not cited to any Supreme Court precedent clearly establishing that a defendant's suppression hearing testimony may not be used to impeach a defense expert who has based his opinions in part on the defendant's statements to him.

21
22
23
In *James v. Illinois*, the Supreme Court reversed a state court decision which had extended the impeachment exception to the exclusionary rule to "permit the prosecution to impeach the testimony of *all* defense witnesses."[6]  493 U.S. 307, 309

24

25
26
27
28
[6] *James* involved the admission of a defendant's unwarned statement that was illegally obtained in violation of *Miranda*.  *James*, 493 U.S. at 309.  The case before this Court involves the petitioner's sworn testimony at a pre-trial suppression hearing.  As a preliminary matter, the parties have not extensively briefed whether the specific portion of the testimony at issue is constitutionally protected, or whether the protections of *James* apply.  *Cf. Simmons v. US*, 390 US 377, 390 (1968) ("When a defendant testifies in support of a motion to suppress evidence on Fourth Amendment

1   (1990).  Although *James* could be broadly interpreted to prohibit the impeachment of
2   *any* defense witness other than the defendant, several state courts have interpreted the
3   decision more narrowly.[7]  *Appling v. State*, 904 S.W.2d 912, 916-17 (Tex. Ct. App.
4   1995); *People v. Williams*, 692 N.E.2d 1109, 1126 (Ill. 1998); *State v. DeGraw*, 470
5   S.E.2d 215, 221-22 (W. Va. 1996); *Wilkes v. United States*, 631 A.2d 880, 885-89
6   (D.C.  1993).    These  state  courts  have  found  more  limited  extensions  of  the
7   impeachment exception consistent with *James*, affirming the use of a defendant's
8   unwarned  statements  to  impeach  defense  witnesses  who  specifically  relate  the
9   defendant's statements to them, or rely on those statements in forming an expert
10  opinion.  *See Appling*, 904 S.W.2d at 916-17; *DeGraw*, 470 S.E.2d at 221-22; *Wilkes*,
11  631 A.2d at 885-89; *see also James*, 493 U.S. at 311-12 (explaining that the Supreme
12  Court "has carved out exceptions to the exclusionary rule" where the "balance"
13  between the truthseeking function of a criminal trial and the deterrent aim of the
14  exclusionary rule favors admissibility).    Given these decisions, the consistent
15  conclusion reached  by  the  California  Court  of  Appeal  was  not  objectively
16  unreasonable.  *See generally Barcheers v. Alameda*, 146 Fed. App'x 100, 103 (9th Cir.
17  2005) (unpublished memorandum decision).

18      Furthermore, even if the trial court's admission of the suppression hearing
19  testimony was error, this Court finds that the error was harmless, as it did not have a
20  "a substantial and injurious effect" on the verdict. *See Brecht v. Abrahamson*, 507 U.S.
21  619, 623 (1993). Claims based on state evidentiary rulings, such as the ruling to admit

22

23  grounds, his testimony may not thereafter be admitted against him at trial on the issue
    of guilt unless he makes no objection.") Because this Court ultimately finds that the
24  petitioner's argument fails even if *James* does apply to the petitioner's pre-trial
    testimony, this Court need not and does not decide the issue.

25

26  [7] The Ninth Circuit has indicated that the opinions of lower courts can be
    relevant in assessing whether the state court's application is "unreasonable" and
27  whether federal law is "clearly established." *Duhaime v. Ducharme*, 200 F.3d 597, 601
    (9th Cir. 1999) (characterizing the decisions of lower federal courts as relevant in
28  assessing whether the state court's application is "unreasonable" and whether federal
    law is "clearly established").

1  or strike a challenged question, are not cognizable in a federal habeas proceeding
2  unless the ruling was so prejudicial that it rendered a trial fundamentally unfair. *Estelle*
3  *v. McGuire*, 502 U.S. 62, 70-73 (1991); *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 897
4  (9th Cir. 1996); *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991) ("While
5  adherence to state evidentiary rules suggests that the trial was conducted in a
6  procedurally fair manner, it is certainly possible to have a fair trial even when state
7  standards are violated; conversely, state procedural and evidentiary rules may
8  countenance processes that do not comport with fundamental fairness.")

9      The question of whether the petitioner wrote the two apology letters in his
10  pocket was tangential to the issue of his guilt or innocence of the crimes charged.  The
11  jury was presented with significant other evidence throughout the trial that bore more
12  directly on the petitioner's guilt, including the testimony of the child victim [Lodg. 1,
13  Vol. 2, pp. 338-350]; crime lab evidence showing the presence of sperm on the child's
14  mouth and t-shirt [Lodg. 1, Vol. 3, pp. 519-20]; medical testimony and photographs of
15  the injuries to the child's genital areas [Lodg. 1, Vol. 2, pp. 401-07, 413]; the testimony
16  of the emergency department nurse to whom the child first reported the assault [Lodg.
17  1, Vol. 2, pp. 286-88]; and the petitioner's own confession to the crimes that was
18  audio-recorded by detectives and played for the jury [Lodg. 1, Vol. 4, p. 908].
19  Furthermore, the trial court instructed the jury that the letters were admitted for a very
20  limited purpose: to assess the petitioner's writing level and ability. [Lodg. 1, Vol. 6, pp.
21  1334-35]

22      The trial court acknowledged that Dr. Waymon's testimony about the petitioner's
23  writing ability and educational level was a foundational part of the defense's false
24  confession theory. [Lodg. 1, Vol. 6, pp. 1287-88] ("This has become the cornerstone
25  of the defense case, is (*sic*.) his intellectual functioning and how low it is to support the
26  position that it's a false confession.") However, Dr. Waymon was not the only defense
27  expert witness to testify about the theory of false confessions or about the petitioner's
28

1   intellectual functioning.  The defense called Dr. Leo to testify as an expert on false
2   confessions and the link between an individual's low IQ and the possibility of a false
3   confession. [Lodg. 1, Vol. 6, pp. 1218-78] The defense called the petitioner's uncle to
4   testify that the petitioner "had trouble learning," "was a slow learner," and "was [] a
5   special ed kid." [Lodg. 1, Vol. 5, p. 1131] Therefore, even without the testimony of Dr.
6   Waymon, the defense still introduced significant evidence at trial from which to argue
7   its theory of false confession.  This Court cannot say that the error, if any, denied the
8   petitioner his ability to present a defense or otherwise so fundamentally infected the
9   trial as to require habeas relief.

10      Finding no constitutional error and no harm to the petitioner, this Court
11  RECOMMENDS that the petitioner's first claim be DENIED.

12  **C.   Petitioner's Argument That The Victim Was Not "10 Years Of Age Or
     Younger" (Claim 2) Is Not a Cognizable Federal Claim**
13      The petitioner contends in Claim 2 that he was improperly convicted of
14  committing sexual assault against a child "ten years of age or younger" under the
15  California Penal Code when the child was older than 10 years but less than 11 years at
16  the time of the offense.  The California Court of Appeal denied the claim on direct
17  appeal on the grounds that the California Supreme Court has concluded that "ten years
18  of age or younger" in a sex crime statute means "under 11 years of age" and therefore
19  includes children who have reached their 10th birthday but have not yet reached their
20  11th birthday. [Lodg. 12-17, p. 15] (citing *People v. Cornett*, 53 Cal.4th 1261, 1275
21  (2012)).  Because the victim was under 11 years old at the time of the offense, the
22  Court of Appeal found that the petitioner was properly convicted under the statute.

23      The petitioner's argument in the FAP is easily rejected because it does not raise
24  a cognizable federal claim.  Federal habeas relief is available only to state prisoners
25  who are "in custody in violation of the Constitution or laws or treaties of the United
26  States." 28 U.S.C. §§ 2241, 2254.  Federal courts "are bound by a state court's
27  construction of its own penal statute." *Aponte v. Gomez*, 993 F.2d 705, 707 (9th Cir.
28

1  1993).  Absent an independent Federal constitutional violation, "it is not the province

2  of a federal habeas court to re-examine state-court determinations on state-law

3  questions." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  This Court must defer to the

4  state court's construction unless it is "untenable or amounts to a subterfuge to avoid

5  federal review of a constitutional violation." *Oxborrow v. Eikenberry*, 877 F.2d 1395,

6  1399 (9th Cir. 1989).

7        Likewise, to the extent the petitioner may raise a federal constitutional claim of

8  actual or legal innocence based on the victim's age, this argument is also foreclosed by

9  the California Supreme Court's decision in *Cornett*. *Cf. Vosgien v. Persson*, 742 F.3d

10  1131, 1135-36 (9th Cir. 2014) ("One way a petitioner can demonstrate actual innocence

11  is to show in light of subsequent case law that he cannot, as a legal matter, have

12  committed the alleged crime.") The petitioner's interpretation of state law is incorrect.

13  Because his victim was less than 11 years old at the time of the offenses, the petitioner

14  is not legally innocent of offenses with a child 10 years of age or younger.  *People v.*

15  *Cornett*, 53 Cal.4th 1261, 1275 (2012) ("We are persuaded here that our Legislature

16  intended '10 years of age or younger' as used in section 288.7 to be another means of

17  saying 'under 11 year of age' in accordance with the ordinary understanding of

18  'age.'").  Federal courts "are bound by a state court's construction of its own penal

19  statutes." *Aponte v. Gomez*, 993 F.2d 705, 707 (9th Cir. 1993); *Bradshaw v. Richey*,

20  546 U.S. 74, 76 (2005).  This Court must defer to the state court's construction unless

21  it is "untenable or amounts to a subterfuge to avoid federal review of a constitutional

22  violation." *Oxborrow v. Eikenberry*, 877 F.2d 1395, 1399 (9th Cir. 1989).

23        Accordingly, this Court RECOMMENDS that the District Court DENY the

24  petitioner's claim.

25  //

26  //

27  //

28

**D. Petitioner Is Not Entitled To Habeas Relief On The Basis Of The Trial Court's Decision To Permit The Child Witness To Be Accompanied To The Witness Stand By Both A Support Advocate And Therapy Dog or by the Prosecutor Calling the Support Person A "Victim Advocate" (Claim 3)**

In Claim 3, the petitioner contends that he was denied due process of law when (1) the trial court allowed the child have both a therapy dog and a support advocate accompany her to the witness stand during her trial testimony, and (2) when the trial court allowed the prosecutor to introduce the support advocate to the jury as a "victim" advocate. [Doc. 1, p. 8] On direct appeal, the California Court of Appeal found that therapy dogs are not "persons," and therefore the trial court did not violate or misinterpret the applicable state statute by permitting the victim to be accompanied by both a support advocate and a therapy dog.[8] [Lodg. 6, pp. 55-56] The Court of Appeal also rejected the petitioner's claim that the presence of the human support person and the prosecutor's label of that person as a "victim advocate" caused the petitioner prejudice at trial. *Id.* at 45, 57. This Court will consider each of the petitioner's contentions in turn.

First, the petitioner's claim that the support advocate and the therapy dog denied him due process by endorsing the child's testimony or undermining the presumption of innocence is without merit. The witness testified under oath and in full view of the jury while trial counsel conducted cross examination, thus enabling the jury to observe her demeanor and evaluate her credibility. [Lodg. 1, Vol. 2, pp. 338-50] The support person neither testified nor said anything at trial. *Id.* It appears from the record that the therapy dog sat at D.'s feet and was likewise unobtrusive. *Id.* Decisions from the

---

[8] Section 868.5(a) states: "Notwithstanding any other law, a prosecuting witness [in certain cases]... shall be entitled, for support, to the attendance of up to two persons of his or her own choosing, one of whom may be a witness, at the preliminary hearing and at the trial...." As discussed previously, this Court is not permitted on federal habeas review to interpret or determine whether the state court appropriately applied state law. *Aponte v. Gomez*, 993 F.2d 705, 707 (9th Cir. 1993); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). Accordingly, the portions of petitioner's arguments that center on the interpretation and application of provisions of the California Penal Code are not properly before the Court.

- 17 -

14cv1624-BAS (KSC)

1  United States Supreme Court have upheld the use of special procedures to protect child
2  witnesses. *E.g., Maryland v. Craig*, 497 U.S. 836, 852 (1990) (finding that the
3  confrontation clause did not categorically prohibit child witness from testifying at trial
4  by one-way closed circuit television).  The petitioner has not identified any "clearly
5  established" constitutional law to support his argument, nor has he presented any
6  evidence showing that the presence of the support person and therapy dog adversely
7  influenced the jury. It was not unreasonable for the appellate court to conclude that the
8  petitioner's due process rights were not violated by the presence of the support
9  advocate and the therapy dog. The petitioner cannot prevail on this claim.

10        The petitioner's second claim that the prosecutor's reference to the support
11  advocate as a "victim advocate" in the presence of the jury violated his due process
12  rights is similarly without merit. The record demonstrates that the trial court and the
13  prosecutor were very careful throughout the trial to *not* refer to D. as a "victim." The
14  word "victim" was only said once throughout the trial in connection with D., and that
15  was when the prosecutor announced to the jury, "[D.] will be accompanied by a victim
16  advocate named Norie Figueroa from our office and a canine therapy dog." [Lodg. 1,
17  Vol. 2, p. 338] Notably, the trial court never referred to D. as a victim. The petitioner
18  presents no evidence to show that this single, isolated use of the word "victim"
19  influenced the jury's perception of D.'s testimony.  To the contrary, the Court
20  instructed the jury before trial that "[w]hat the attorneys say during the course of the
21  trial is *not* evidence." [Lodg. 1, Vol. 1, p. 194] (emphasis added). In the absence of
22  evidence to the contrary, this Court must assume that the jury followed this instruction.
23  *Weeks*, 528 U.S. at 234.

24        In sum, the Court finds that neither the presence of the support advocate and
25  therapy dog, nor the prosecutor's single, isolated use of the phrase "victim advocate,"
26  so fundamentally infected the trial process as to violate the petitioner's due process
27  rights. Furthermore, even if constitutional error had occurred, that error would have
28

1   been harmless because it did not have a "a substantial and injurious effect" on the

2   verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). As discussed at length

3   in Subsection B., above, the prosecution introduced sufficient other evidence at trial

4   beyond the testimony of D. to justify the conviction and support D.'s story. It is

5   therefore RECOMMENDED that the petitioner's third claim be DENIED.

6   **E. Petitioner's Claim That The Prosecutor's Improper Hypothetical Question**

7   **Violated His Due Process Rights (Claim 4) Is Procedurally Defaulted**

        The petitioner contends that he was denied due process when the prosecutor

8   posed an improper hypothetical question to a medical witness that essentially asked the

9   witness to comment on the strength of the prosecutor's evidence in the case. [Doc. 4,

10   pp. 6-9] At trial, the prosecutor asked a criminalist with the San Diego Police

11   Department Crime Laboratory, "if someone by the name of [D.] says that she is

12   sexually assaulted by someone by the name of James Spence, is there any evidence that

13   you tested in this case that contradicts that story?" [Lodg. 1, Vol. 3, p. 575] Over the

14   defense's objections, the witness responded in the negative. *Id.* On direct appeal, the

15   Court of Appeal "acknowledge[d] that the medical expert arguably was asked to testify

16   directly about the guilt of Spence, since the question posed named him and essentially

17   asked whether he had any meritorious defense in the evidence, or was guilty." [Lodg.

18   6, p. 44] The Court of Appeal stated, "we disapprove of this form of questioning. We

19   are satisfied, however, that any error in allowing it was harmless." *Id.* at 44-45.

20       The petitioner failed to raise this claim in his Petition for Review before the

21   California Supreme Court.[9] *See* [Lodg. 7] Accordingly, this claim is not properly before

22   this Court on federal habeas review. The exhaustion of available state remedies by

23   presentation to the state's highest court has long been a prerequisite to a federal court's

24

25   _____

26       [9] The respondent argued that this claim is procedurally defaulted for its failure
    to raise a cognizable federal issue. [Doc. 11-1, p. 41] While this Court rejects that
27   argument and finds that the claim does raise a constitutional due process concern, the
    Court finds that the claim is procedurally defaulted because it was not raised before the
28   California Supreme Court. *See infra.*

1   consideration of claims presented in a habeas corpus proceeding.  28 U.S.C.A. §
2   2254(b); *Rose v. Lundy*, 455 U.S. 509, 522 (1982).  As a matter of federal-state comity,
3   federal courts generally do not consider a claim in habeas corpus proceedings until the
4   state courts have had an opportunity to act upon the claim.  *Id.* at 515.

5       Because the time for filing a petition for review or a state habeas corpus petition
6   in the California Supreme Court has now expired, the petitioner's claim is technically
7   exhausted but procedurally defaulted.  *See Cassett v. Stewart*, 406 F.3d 614, 621 n.5
8   (9th Cir. 2005) ("A habeas petitioner who has defaulted his federal claims in state court
9   meets the *technical* requirements for exhaustion; there are no state remedies any longer
10  'available' to him."); *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991) (holding
11  that a procedural default arises when "the court to which the petitioner would be
12  required to present his claims in order to meet the exhaustion requirement would now
13  find the claims procedurally barred").  The Ninth Circuit has held that "because the
14  California untimeliness rule is not interwoven with federal law, it is an independent
15  state procedural ground." *Bennett v. Mueller*, 322 F.3d 573, 581 (9th Cir. 2003). *See*
16  *also Walker v. Martin*, 562 U.S. 307, 131 S.Ct. 1120, 1125-31 (2011) (holding that
17  California's timeliness requirement providing that a prisoner must seek habeas relief
18  without "substantial delay" as "measured from the time the petitioner or counsel knew,
19  or should reasonably have known, of the information offered in support of the claim
20  and the legal basis for the claim," is clearly established and consistently applied).

21      Notwithstanding the procedural default, this Court may reach the merits of the
22  claim if the petitioner can demonstrate cause for his failure to satisfy the state
23  procedural rule and prejudice arising from the default, or that a fundamental
24  miscarriage of justice would result from the Court not reaching the merits of the
25  defaulted claim. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  This Court will
26  address the three considerations of cause, prejudice, and fundamental fairness in turn,
27  below, finding ultimately no basis for reaching the merits of this claim.

28

1    *I. Cause*

2         The cause prong can be satisfied if Petitioner shows an "objective factor" that

3    precluded him from raising his claim in state court, such as interference by state

4    officials or constitutionally ineffective counsel. *McCleskey v. Zant*, 499 U.S. 467,

5    493-94 (1991). The petitioner provides no explanation, however, for his failure to raise

6    Claim 4 in his petition for review before the California Supreme Court. Because, as

7    discussed below, Claim 4 is without merit, the only reason apparent in the record for

8    the failure to present this claim to the California Supreme Court is a strategic choice

9    by appellate counsel not to raise a weak claim. *See Miller v. Keeney*, 882 F.2d 1428,

10   1434 (9th Cir. 1989) (holding that appellate counsel has no constitutional obligation

11   to raise every nonfrivolous issue on appeal because "[i]n many instances, appellate

12   counsel will fail to raise an issue because she foresees little or no likelihood of success

13   on that issue; indeed, the weeding out of weaker issues is widely recognized as one of

14   the hallmarks of effective appellate advocacy.") Thus, the petitioner is unable to rely

15   on actions or omissions by his appellate counsel to establish cause to excuse the

16   default. *See Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000) ("Although we have

17   not identified with precision exactly what constitutes 'cause' to excuse a procedural

18   default, we have acknowledged that in certain circumstances counsel's ineffectiveness

19   in failing properly to preserve the claim for review in state court will suffice. Not just

20   any deficiency in counsel's performance will do, however; the assistance must have

21   been so ineffective as to violate the Federal Constitution.") (citation omitted). The

22   Court finds that the petitioner has not shown cause to excuse the default.

23   *II. Prejudice*

24        "Prejudice [to excuse a procedural default] is actual harm resulting from the

25   alleged error." *Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998). The petitioner

26   cannot demonstrate prejudice arising from the failure of this Court to reach the merits

27   of Claim 4 sufficient to excuse the default because his claim is without merit.

28

Although the petitioner claims that the allegedly improper hypothetical question usurped the jury's function by asking a witness to opine on the ultimate factual question of the petitioner's guilt, this Court finds, as did the California Court of Appeal, that any error was harmless and did not render the trial fundamentally unfair. As discussed in Subsections B and D, *supra*, both the prosecution and the defense presented the jury with significant other evidence that bore more directly on the petitioner's guilt, including the testimony of the child victim [Lodg. 1, Vol. 2, pp. 338-350]; crime lab evidence showing the presence of sperm on the child's mouth and t-shirt [Lodg. 1, Vol. 3, pp. 519-20]; medical testimony and photographs of the injuries to the child's genital areas [Lodg. 1, Vol. 2, pp. 401-07, 413]; the testimony of the emergency department nurse to whom the child first reported the assault [Lodg. 1, Vol. 2, pp. 286-88]; and the petitioner's own confession to the crimes that was audio-recorded by detectives and played for the jury [Lodg. 1, Vol. 4, p. 908]. Furthermore, the trial court properly instructed the jury on how to consider that evidence. [Lodg. 1, Vol. 1, p. 194; Lodg. 1, Vol. 6, pp. 1327-45]

In conclusion, the petitioner has failed to show that the court's admission of the improper hypothetical was so prejudicial that it rendered his trial fundamentally unfair. *McGuire*, 502 U.S. at 70-73; *Ortiz-Sandoval*, 81 F.3d at 897; *Jammal*, 926 F.2d at 919-20. The petitioner therefore cannot establish "actual harm" from this Court's failure to reach the merits of the claim sufficient to excuse the default arising from the failure to present the claim on direct appeal. *Vickers*, 144 F.3d at 617.

### III. Fundamental Miscarriage of Justice

The petitioner can still avoid the procedural default if he can demonstrate that a fundamental miscarriage of justice would result from this Court's failure to reach the merits of the claim. The "miscarriage of justice" exception is limited to petitioners who can show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). "In order to pass

1 through *Schlup's* gateway, and have an otherwise barred constitutional claim heard on
2 the merits, a petitioner must show that, in light of all the evidence, including evidence
3 not introduced at trial, 'it is more likely than not that no reasonable juror would have
4 found petitioner guilty beyond a reasonable doubt.'" *Majoy v. Roe*, 296 F.3d 770, 775-
5 76 (9th Cir. 2002), quoting *Schlup*, 513 U.S. at 327.  In applying this standard, "[a]
6 petitioner need not show that he is 'actually innocent' of the crime he was convicted
7 of committing; instead, he must show that 'a court cannot have confidence in the
8 outcome of the trial.'" *Majoy*, 296 F.3d at 776 (quoting *Carriger v. Stewart*, 132 F.3d
9 463, 478 (9th Cir. 1987) (en banc) (quoting *Schlup*, 513 U.S. at 316)).

10       Even if the prosecutor's question improperly led the witness to render an opinion
11 on the weight of the evidence, the state had introduced plenty of evidence at trial that
12 was suitable for the jury's independent review. *See Section* V.E.II, *supra*.  On balance,
13 in light of all the evidence at trial, this Court finds that the petitioner has not shown
14 that, but for the improper question, it is more likely than not that no reasonable juror
15 would have found him guilty beyond a reasonable doubt, or that the Court cannot have
16 confidence in the outcome of the trial.  *Majoy*, 296 F.3d at 776; *Schlup*, 513 U.S. at
17 314-15.

18       ### *IV.  Claim 4 Is Procedurally Defaulted*

19       Accordingly, the Court finds Claim 4 to be procedurally defaulted, and that the
20 petitioner has failed to demonstrate an entitlement to excuse the default.  Alternately,
21 the Court finds that, even assuming the petitioner could excuse the default and the
22 Court could reach the merits of the claim, the claim is without merit, even under *de*
23 *novo* review, for the reasons set forth above regarding why the petitioner is unable to
24 demonstrate prejudice to excuse the default.  *See Slovik v. Yates*, 556 F.3d 747, 751 n.4
25 (9th Cir. 2009) (the standard of review applicable to claims which are technically
26 exhausted and procedurally defaulted is unclear).  It is therefore RECOMMENDED
27 that Claim 4 be DENIED.

28

# VI. CONCLUSION

For the reasons outlined above, IT IS HEREBY RECOMMENDED that the Court issue an order (1) approving and adopting this Report and Recommendation; and, (2) DENYING the Petition for Writ of Habeas Corpus.

IT IS HEREBY ORDERED THAT **no later than April 6, 2015**, any party may file written objection with the District Court and serve a copy on all parties. The document should be entitled "Objections to Report and Recommendation."

IT IS FURTHER ORDERED THAT any reply to the objections shall be filed with the District Court and served on all parties **no later than April 20, 2015** or two weeks after the objections have been electronically docketed, whichever is later. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the District Court's order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

IT IS SO ORDERED.

Date: March ___6___, 2015

KAREN S. CRAWFORD
United States Magistrate Judge